**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DIVISION OF VIRGINIA**
**ABINGDON DIVISION**

**WILLIAM HEIM, by his guardian,**
**NICOLE MARIE BRITTAIN,**

***Plaintiff,***

**v.**

**Case No.: 1:25CV00004**

**ZACHARY PUCKETT,**

**JURY DEMANDED**

**and,**

**JENNY BAIN,**

**and,**

**THOMAS BETTINGER,**

**and,**

**KAITLYN STUART,**

**and,**

**JOCK SONGER,**

**and,**

**CHRISTOPHER WILLARD,**

**and,**

**KIMBERLY D. HAUG,**

**and,**

**NEW RIVER VALLEY REGIONAL**
**JAIL AUTHORITY,**

***Defendants.***

**THIRD AMENDED COMPLAINT**

NOW COMES the Plaintiff, William Heim, by his Guardian, Nicole Marie Brittain, and through counsel, and as and for his Third Amended Complaint against the Defendants, states as follows:

## Nature of Action

1. This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking damages against the Defendants for acts committed under the color and authority of state law, which deprived the Plaintiff of rights secured under the Constitution and laws of the United States of America and the Constitution of Virginia.
2. In addition, this action seeks damages against the Defendants for gross negligence, and willful and wanton negligence.

## Jurisdiction and Venue

3. Jurisdiction exists in this case pursuant to the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331 and 1343.
4. This Court has pendent and supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.
5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the events underlying this action occurred within the jurisdiction of the United States District Court for the Western District of Virginia, Abingdon Division.

## The Parties

6. Plaintiff William Heim ("Plaintiff") is and was at all times relevant to this Complaint a resident of the Commonwealth of Kentucky.
7. Defendant Zachary Puckett was at all times relevant to this Complaint a police officer employed by the Town of Wytheville Police Department, a resident of the

Commonwealth of Virginia, and acting under color of state law. He is sued in his individual capacity.

8. Defendant Jenny Bain was at all times relevant to this Complaint a correctional officer employed by the New River Valley Regional Jail Authority, a resident of the Commonwealth of Virginia, and acting under color of state law. She is sued in her individual capacity.

9. Defendant Thomas Bettinger was at all times relevant to this Complaint a correctional officer employed by the New River Valley Regional Jail Authority, a resident of the Commonwealth of Virginia, and acting under color of state law. He is sued in his individual capacity.

10. Defendant Kaitlyn Stuart was at all times relevant to this Complaint a correctional officer employed by the New River Valley Regional Jail Authority, a resident of the Commonwealth of Virginia, and acting under color of state law. She is sued in her individual capacity.

11. Defendant Jock Songer was at all times relevant to this Complaint a correctional officer employed by the New River Valley Regional Jail Authority, a resident of the Commonwealth of Virginia, and acting under color of state law. He is sued in his individual capacity.

12. Defendant Christopher Willard was at all times relevant to this Complaint a correctional officer employed by the New River Valley Regional Jail Authority, a resident of the Commonwealth of Virginia, and acting under color of state law. He is sued in his individual capacity.

13. Defendant Kimberly D. Haug is Superintendent of the New River Valley Regional Jail

Authority, a resident of the Commonwealth of Virginia, and acting under color of state law. She is sued in her individual capacity.

14. The New River Valley Regional Jail Authority is a political subdivision of the Commonwealth of Virginia – a "municipal conglomerate," in the words of one court – that is a "person" for purposes of 42 U.S.C. § 1983. *See Newbrough v. Piedmont Reg'l Jail Auth*., 822 F. Supp. 558, 572 (E.D. Va. 2011).

**Factual Allegations**

15. On April 26, 2023, the Plaintiff was operating a tractor trailer in the course and scope of his employment while in the Town of Wytheville.

16. The Plaintiff suffered a medical emergency while operating his tractor trailer, which caused him to be involved in a motor vehicle accident at the intersection of E. Main Street and 11th Street in the Town of Wytheville.

17. Further medical testing would reveal that the Plaintiff suffered a stroke just prior to the motor vehicle accident.

18. Defendant Puckett arrived to investigate the accident at approximately 12:22pm.

19. Defendant Puckett made contact with the Plaintiff and determined that the Plaintiff was mumbling, not making any sense, and disoriented. Defendant Puckett noted that the Plaintiff started gazing off into the distance and discussing a motel rather than the motor vehicle accident.

20. Defendant Puckett immediately assumed that the Plaintiff was under the influence of some unknown substance.

21. Defendant Puckett did not render any emergency medical services at the scene of the accident before, during, or after his investigation.

22. Defendant Puckett did not call for any emergency medical services providers to come to the scene of the accident.

23. Defendant Puckett administered an alphabet test, a number counting test, a finger to nose test, and a finger dexterity test to the Plaintiff.

24. Defendant Puckett noted that the Plaintiff failed each test and was swaying during the testing process.

25. Defendant Puckett then performed a preliminary breath test ("PBT") and alleged that the test returned a result of 0.01 (well below the legal limit and likely a false positive), and in response, Defendant Puckett placed the Plaintiff under arrest for violating Code of Virginia § 18.2-266.

26. Defendant Puckett then conducted a search of the Plaintiff's tractor trailer, where he failed to locate any alcoholic beverage containers of any kind, and similarly failed to locate any narcotics or narcotic paraphernalia.

27. Defendant Puckett located the Plaintiff's wallet during the search of the tractor trailer and discovered that the Plaintiff has a drivers' license issued by the Commonwealth of Kentucky, despite the Plaintiff having previously said that he possessed a Tennessee license.

28. Defendant Puckett then asked the Plaintiff to consent to a blood draw, to which Defendant Puckett allegedly believed the Plaintiff consented.

29. A blood draw from the Plaintiff was taken at approximately 1:55pm.

30. Defendant Puckett then transported the Plaintiff to the magistrate's office where he obtained a warrant for the Plaintiff's alleged driving under the influence.

31. The Plaintiff was then committed, at approximately 2:42pm, to the New River Valley

Regional Jail until he was deemed sober.

32. At no point did Defendant Puckett have the Plaintiff examined for any injuries following the motor vehicle accident, despite the Plaintiff's disorientation, wayward gaze, confusing answers to questions, and inability to focus on questions asked of him.

33. The Plaintiff, while in the custody and care of the New River Valley Regional Jail Authority, was not offered any medical services.

34. The Plaintiff, for the entire time he was in the custody and care of the New River Valley Regional Jail Authority, was disoriented, confused, mumbling, and incontinent.

35. The Plaintiff had never been detained at the New River Valley Regional Jail prior to April 26, 2023, and had never met or had any interaction with the defendants prior to this date.

36. Defendants Bain, Bettinger, Stuart, Songer, and Willard all had duties in making rounds at the New River Valley Regional Jail to actually physically observe the Plaintiff to ensure his safety and well-being.

37. Defendants Bain and Bettinger had duties to actually physically observe the Plaintiff on April 26, 2023, from the time he arrived at the facility until 6pm.

38. Bain and Bettinger repeatedly signed logs indicating that they had observed Mr. Heim at various intervals from the time he was committed to the jail until 6:00 PM.

39. Despite Defendants Bain and Bettinger having duties to observe the Plaintiff on April 26, 2023, neither Defendant Bain nor Bettinger offered the Plaintiff any medical treatment on April 26, 2023.

40. Defendants Stuart, Songer, and Willard had duties to actually physically observe the Plaintiff from 6pm on April 26, 2023, until 6am on April 27, 2023.

41. Stuart, Songer, and Willard repeatedly signed logs indicating that they had observed Mr. Heim at various intervals from 6:00 PM on April 26, 2023, until 6:00 AM on April 27, 2023.

42. Despite Defendants Stuart, Songer, and Willard having duties to observe the Plaintiff on April 26, 2023, and April 27, 2023, none of them offered the Plaintiff any medical treatment on April 26, 2023, or April 27, 2023.

43. Defendants Bain and Bettinger had duties to actually physically observe the Plaintiff from 6am on April 27, 2023 until the time the Plaintiff was released from the facility in the late afternoon.

44. Bain and Bettinger repeatedly signed logs indicating that they had observed Mr. Heim at various intervals from 6:00 AM on April 27, 2023, until his release from the facility.

45. Despite Defendants Bain and Bettinger having duties to observe the Plaintiff on April 27, 2023, neither Defendant Bain nor Bettinger offered the Plaintiff any medical treatment on April 27, 2023, until at least late in the afternoon.

46. A universal drug screen was conducted on the Plaintiff, which was completely negative.

47. At approximately 4:45pm on April 27, 2023, more than 28 hours after the accident, Defendant Bain called Angela Strater, sister of the Plaintiff (who lives in Florida), and asked her to pick up the Plaintiff from New River Valley Regional Jail.

48. Defendant Bain told Strater that the Plaintiff had been disorientated during his entire commitment at the facility and had been unable to control his bodily functions, including urinating on himself several times.

49. Defendant Bain asked Strater whether this was usual behavior for the Plaintiff.

50. Strater forcefully informed Defendant Bain that it was not usual behavior, and begged

Defendant Bain to get the Plaintiff emergency medical treatment.

51. Defendant Bain twice refused Strater's requests to get the Plaintiff medical attention, stating "we have no medical assistance at the jail" and "we don't have anyone here who can help him," until Strater asked a third time.

52. Bain reluctantly sent Mr. Heim to the jail's medical department, which gave him a urine test to look for a urinary tract infection and a blood glucose test.

53. It was only at that point in time, after those tests produced normal results, that the Plaintiff was given access to emergency medical treatment.

54. Emergency medical services providers transported the Plaintiff to the New River Valley Medical Center, with an approximate arrival time of 6:21pm. The Plaintiff was completely without any access to emergency medical services for 30 hours.

55. The Plaintiff was unable to accurately tell the healthcare professionals at the medical center the date, year, location, or anything that occurred since the motor vehicle accident.

56. The tests and medical services provided to the Plaintiff revealed that he had suffered an acute stroke.

57. The Plaintiff then was transferred to Lewis Gale Medical Center in Salem, Virginia.

58. The medical professionals at Lewis Gale Medical Center confirmed that the Plaintiff had suffered a stroke.

59. The total and complete abject failure of any of the defendants to offer the Plaintiff any medical attention for nearly 30 hours meant that the Plaintiff was not a candidate for tissue plasminogen activator treatment ("tPA").

60. To be successful, tPA typically must be administered within three to four hours of the stroke. In some cases, tPA may be effective when administered more than four hours

after a stroke, but the sooner tPA is administered, the better the outcome for stroke victims.

61. Some stroke patients can benefit from thrombectomy when that treatment is administered within 24 hours after symptom onset. Mr. Heim was still at the Jail and had not received any medical treatment more than 24 hours after his stroke symptoms began.

62. The behaviors that Defendant Puckett were quick to characterize as indicators of being under the influence of alcohol or illicit drugs are classic signs of a stroke. Defendant Puckett, through his employment and training, knew, or should have known, that the Plaintiff was suffering from a serious medical emergency.

63. Despite the failure of Defendant Puckett to find any evidence on the Plaintiff's person or in his motor vehicle to support his hasty and pre-determined conclusion that Plaintiff was under the influence of a substance, he failed to reconsider his findings, and sentenced the Plaintiff to a significantly and undoubtedly adverse outcome.

64. Knowing that the Plaintiff had allegedly blown a 0.01 on the PBT and was having symptoms inconsistent with that alleged level of influence, Defendant Puckett did nothing to render any aid to the Plaintiff.

65. Defendants Bain, Bettinger, Stuart, Songer, and Willard, despite knowing that the PBT was allegedly a 0.01, and the drug screen was negative, waited approximately 26 hours before making any outreach, and even then, the first outreach was to the Plaintiff's sister, and not to a medical professional.

66. The results of the blood draw demonstrated that the Plaintiff had no alcohol or drugs in his bodily system at the time of his detainment and commitment.

67. The criminal charges were discharged *nolle prosequi* at the request of the Commonwealth

of Virginia.

68. At all times while the Plaintiff was in the control and custody of the various defendants, he had the status of a "pretrial detainee."

69. Plaintiff suffered extensive and permanent injuries because of the Defendants' failure to provide any emergency medical care. Plaintiff has been placed under a guardianship, and requires assistance 24 hours a day, seven days a week in order to survive.

70. For years preceding Mr. Heim's detention and continuing through the present, detainees at NRVRJ have repeatedly alleged that NRVRJ staff ignore or delay responses to obvious, urgent medical needs and withhold prescribed treatments, reflecting a jail wide custom of deliberate indifference to serious medical conditions. *See, e.g.*, *Perry v. Lilly*, No. 7:23-cv-00089 (W.D. Va. Dec. 1, 2023) (allegations that NRVRJ officers and medical staff disregarded repeated pleas for help and failed to obtain medical care for an arrestee shortly after booking); *Wright v. Ferguson*, No. 7:22-cv-00395 (W.D. Va. Sept. 26, 2023) (claims of deliberate indifference to detainee's medical needs at NRVRJ); *Hatcher v. Hauffman*, No. 7:20-cv-00474 (W.D. Va. July 21, 2021) (allegations that NRVRJ's medical administrator refused to provide prescribed medical treatment); *Barley v. New River Valley Regional Jail—Medical Dep't*, No. 7:16-cv-00280 (W.D. Va. 2017, 2018) (claims regarding failure to treat serious dermatological condition proceeded past dismissal to trial).

71. NRVRJA personnel, including Defendant Bettinger, were sued in this Court for deliberate indifference on February 10, 2023 – two and a half months prior to the incident at issue in this case. *Perry v. Lilly*, No. 7:23-CV-00089. That complaint put Defendant Haug on notice that her subordinates were violating the clearly established Fourteenth

Amendment rights of pretrial detainees and should have prompted her to provide additional training, issue appropriate discipline, or otherwise address the problem. The detainee in the *Perry* case alleges, among other things, "that he continued to scream in pain and beg for help after [correctional officers] threw him in another cell; and that his cries for help were ignored for an hour and a half." *Perry*, 2023 WL 7305055, at *5 (W.D. Va. Nov. 6, 2023) (denying motion to dismiss deliberate indifference claim). In other words, he alleges that correctional officers at NRVRJ ignored his need for medical attention.

72. NRVRJ's pattern of ignoring acute medical conditions was publicly spotlighted by the 2019 in-custody death of 18-year-old Aris Eduardo Lobo-Perez, reported as caused by opioid toxicity compounded by asthma. That death, and the surrounding coverage, placed NRVRJ on public notice that its intake and monitoring practices were failing to identify and timely treat detainees in medical crisis.

73. Upon information and belief, the recurrence of these incidents over multiple years, involving different detainees and different NRVRJ staff, evidences a persistent and widespread practice—so common and well-settled as to constitute a custom—of: (a) being deliberately indifferent to the serious medical needs of detainees and inmates; (b) delaying or denying urgent care until regular "sick call" hours; (c) conditioning access to necessary care or outside transport on non-medical considerations (e.g., shift changes, staffing convenience, or cost); and/or (d) using isolation or observation cells as a default response to medical complaints rather than summoning EMS or transporting to the hospital.

74. The NRVRJ Authority and final policymakers—including the Superintendent—had

actual or at least constructive notice of this pattern through: (a) the publicly filed civil-rights suits and opinions identified above; (b) upon information and belief, detainee grievances and appeal records reflecting recurring complaints of withheld or delayed care; and (c) upon information and belief, incident, intake, and mortality/morbidity reviews conducted or available to the Authority in the ordinary course. Despite this notice, the Authority failed to change training, supervision, staffing, or escalation protocols for medical emergencies, thereby tacitly authorizing the unconstitutional practice.

75. Haug received actual or constructive notice of the pattern of serious medical neglect both from publicized inmate deaths (e.g., the 2019 Lobo-Perez case) and specific lawsuits identifying failures to respond to acute medical crises, but nonetheless took no effective action to review, revise, or enforce protocols to ensure prompt EMS activation or transfer to outside care for detainees displaying symptoms of distress, thus condoning a constitutionally deficient status quo.

76. On information and belief, prior to and during Mr. Heim's detention, the NRVRJ Authority either had no training, or grossly inadequate training, in requiring staff to: (a) recognize and immediately escalate signs of obvious medical emergencies; (b) bypass routine "sick call" and routine medical screening protocols for emergent conditions; and (c) summon EMS promptly when a detainee exhibits red-flag symptoms. The recurrence of similar allegations of deliberate indifference to serious medical needs spanning years demonstrates that the need for such training was "so obvious" that the failure to provide it amounts to deliberate indifference.

77. NRVRJA had a policy and practice of having a booking officer complete a medical

screening form based on information provided to the booking officer by the detainee. In other words, NRVRJA's policy and practice required the detainee to have the presence of mind and wherewithal to be able to provide accurate information and assess his own medical needs.

78. Under Haug's supervision, NRVRJ maintained intake and monitoring protocols that failed to ensure immediate assessment by qualified medical staff for detainees showing signs of acute medical distress, instead relying solely on booking officers and self-reporting by detainees—an especially dangerous practice when detainees, like Mr. Heim, were incapacitated or unable to communicate effectively due to a medical emergency such as a stroke.

79. NRVRJA had a policy and practice of not requiring medical staff to screen detainees and inmates until they had been at the jail for *seven days*. Indeed, NRVRJA policy only provided for a medical professional to be present at the jail and accessible to inmates once a week.

80. At Haug's direction or with her knowledge, NRVRJ operated with the policy and practice of only having medical professionals on-site once every seven days, resulting in periods where no medical professional was available to assess or intervene in acute medical emergencies, with Haug failing to remedy this known gap despite repeated incidents and prior litigation highlighting its dangers.

81. The foregoing customs and failures were the moving force behind the constitutional injuries Mr. Heim suffered. Had NRVRJ's policies and training required immediate EMS activation, the prolonged delay and denial of care described above would not have occurred. As Superintendent of NRVRJA, Haug exercises final authority over jail

operations and medical-care policy implementation, including training curricula and emergency-response protocols.

82. By the time of Mr. Heim's detention, Superintendent Haug had actual or constructive knowledge that subordinates at NRVRJ were routinely failing to timely respond to serious medical needs. That knowledge arose from: (a) upon information and belief, her role in reviewing incident reports, grievances, and/or medical-referral logs; and (b) the multiple, widely publicized NRVRJ cases described above alleging similar neglect of detainees' medical needs.

83. Despite this notice, Haug failed to implement or enforce basic emergency-care protocol, such as mandatory immediate EMS activation for detainees showing signs of medical distress and symptoms of life-threatening medical issues, and a clear prohibition on delaying emergent care for non-medical reasons such as cost or scheduling, and Haug failed to retrain or discipline staff whose conduct reflected these known deficiencies. Her inaction in the face of a documented pattern was so inadequate as to show deliberate indifference and tacit authorization of the unconstitutional practices.

84. Haug's failures described above directly caused Mr. Heim's injuries. Because Haug did not promulgate and enforce an immediate-escalation practice, and instead tolerated reliance on routine "sick call" and seven-day medical screening protocols, NRVRJA staff delayed necessary care for Mr. Heim, prolonging his suffering and exacerbating his serious medical needs.

85. The post-2019 public reporting of an in-custody death at NRVRJ caused by buprenorphine toxicity and asthma, together with multiple civil suits alleging deliberate indifference at NRVRJ over several years, made the risk of serious harm from delayed

emergency care obvious to the NRVRJ Authority and Haug. The decision not to implement elementary safeguards (immediate EMS activation; hospital transfer when vital signs or reported symptoms cross red-flag thresholds) makes the violation here not an isolated mishap but the predictable result of the jail's entrenched customs.

86. The Authority's, Haug's, and NRVRJ staff's failures persisted after public suits and reporting placed them on notice, demonstrating deliberate indifference rather than mere negligence.

## Defendants' Duties

87. At all relevant times, each Defendant had nondelegable duties to the Plaintiff, pursuant to the Fourteenth Amendment of the United States Constitution. Among these duties, each Defendant was required to provide the Plaintiff with adequate medical care, and to take reasonable measures to provide for the safety, security, and humane treatment of the Plaintiff.

88. Each Defendant had statutory and common law duties of care owed to the Plaintiff, to include affirmative duties to provide adequate and safe, secure, and humane conditions of detention, including access to adequate medical care.

89. Upon commitment to the New River Valley Regional Jail, the Plaintiff was entitled to a medical assessment, and 24-hour emergency medical care was to be available. Va. Code §§ 53.1-68; 6 V.A.C. 15-40-360; 6 V.A.C. 15-40-370.

90. Each Defendant had an affirmative duty to prevent harm from occurring and to ensure that the Plaintiff's constitutional rights were not violated, as each had ample and realistic opportunities to get the Plaintiff emergency medical treatment long before it was ultimately provided.

**Count I – Deprivation of Civil Rights – 42 U.S.C. § 1983**
**Against Defendant Puckett**

91. The Plaintiff restates and incorporates the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

92. During his detention with the Town of Wytheville Police Department, the Plaintiff had a serious and life-threatening medical need, an acute stroke.

93. Notwithstanding this serious and life-threatening medical need, Defendant Puckett was deliberately indifferent to the Plaintiff's serious medical needs by denying, delaying, and/or withholding the medical services necessary, thereby creating a substantial risk of permanent physical injury resulting in the unnecessary and wanton infliction of pain upon the Plaintiff, all under color of state law and in violation of the Fourteenth Amendment to the United States Constitution.

94. The denial, delay, and/or withholding of the provision of medical care was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.

95. The denial, delay, and/or withholding of the provision of medical care was intentional, careless, reckless, willful and wanton, and/or grossly negligent, and was done with malice and/or deliberate indifference to the safety, well-being, and constitutionally protected rights of the Plaintiff, all in violation of the Fourth Amendment and/or Fourteenth Amendment to the United States Constitution.

96. As a direct and proximate result of the deliberate indifference of Defendant Puckett to the Plaintiff's serious medical needs, the Plaintiff has sustained serious and permanent physical injuries, which has caused him, and will continue to cause him, to expend substantial sums of money for medical treatment, loss of income, and severe and

permanent losses to his lifestyle.

**Count II – Deprivation of Civil Rights – 42 U.S.C. § 1983**
**Against Defendants Bain, Bettinger, Stuart, Songer, Willard**

97. The Plaintiff restates and incorporates the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

98. During his detention with the New River Valley Regional Jail, the Plaintiff had a serious and life-threatening medical need, an acute stroke.

99. Notwithstanding this serious and life-threatening medical need, Defendants Bain, Bettinger, Stuart, Songer, and Willard were deliberately indifferent to the Plaintiff's serious medical need, by denying, delaying, and/or withholding the medical services necessary, thereby creating a substantial risk of permanent physical injury resulting in the unnecessary and wanton infliction of pain upon the Plaintiff, all under color of state law and in violation of the Fourteenth Amendment to the United States Constitution.

100. The denial, delay, and/or withholding of the provision of medical care was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.

101. The denial, delay, and/or withholding the provision of medical care was intentional, careless, reckless, willful and wanton, and/or grossly negligent, and was done with malice and/or deliberate indifference to the safety, well-being, and federal protected rights of the Plaintiff, all in violation of the Fourteenth Amendment to the United States Constitution.

102. As a direct and proximate result of the deliberate indifference of Defendants Bain, Bettinger, Stuart, Songer, and Willard to the Plaintiff's serious medical needs, the Plaintiff has sustained serious and permanent physical injuries, which has caused him,

and will continue to cause him, to expend substantial sums of money for medical treatment, loss of income, and severe and permanent losses to his lifestyle.

**Count III – Gross Negligence**
**Against Defendant Puckett**

103. The Plaintiff restates and incorporates the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

104. During his detention with the Town of Wytheville Police Department, the Plaintiff had a serious and life-threatening medical need, an acute stroke.

105. Notwithstanding this serious and life-threatening medical need, Defendant Puckett exhibited a degree of negligence showing indifference to Plaintiff and an utter disregard of prudence that amounted to a complete neglect of the safety of Plaintiff, by denying, delaying, and/or withholding the medical services necessary, thereby creating a substantial risk of permanent physical injury resulting in the unnecessary and wanton infliction of pain upon the Plaintiff.

106. The denial, delay, and/or withholding the provision of medical care was intentional, careless, reckless, willful and wanton, and/or grossly negligent, and was done with malice and/or deliberate indifference to the safety of the Plaintiff. Defendant Puckett failed to exercise even slight diligence or scant care.

107. As a direct and proximate result of the gross negligence of Defendant Puckett, , the Plaintiff has sustained serious and permanent physical injuries, which has caused him, and will continue to cause him, to expend substantial sums of money for medical treatment, loss of income, and severe and permanent losses to his lifestyle.

**<u>Count IV – Gross Negligence</u>**
**Against Defendants Bain, Bettinger, Stuart, Songer, Willard**

108. The Plaintiff restates and incorporates the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

109. During his detention with the New River Valley Regional Jail, the Plaintiff had a serious and life-threatening medical need, an acute stroke.

110. Notwithstanding this serious and life-threatening medical need, Defendants Bain, Bettinger, Stuart, Songer, and Willard exhibited a degree of negligence showing indifference to Plaintiff and an utter disregard of prudence that amounted to a complete neglect of the safety of Plaintiff, by denying, delaying, and/or withholding the medical services necessary, thereby creating a substantial risk of permanent physical injury resulting in the unnecessary and wanton infliction of pain upon the Plaintiff.

111. The denial, delay, and/or withholding the provision of medical care was intentional, careless, reckless, willful and wanton, and/or grossly negligent, and was done with malice and/or deliberate indifference to the safety of the Plaintiff. Defendants Bain, Bettinger, Stuart, Songer, and Willard failed to exercise even slight diligence or scant care.

112. As a direct and proximate result of the gross negligence of Defendants Bain, Bettinger, Stuart, Songer, and Willard to the Plaintiff's serious medical needs, the Plaintiff has sustained serious and permanent physical injuries, which has caused him, and will continue to cause him, to expend substantial sums of money for medical treatment, loss of income, and severe and permanent losses to his lifestyle.

**Count V – Deprivation of Civil Rights – 42 U.S.C. § 1983 – Supervisory Liability Against Defendant Haug**

113. The Plaintiff restates and incorporates the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

114. As Superintendent of New River Valley Regional Jail Authority, Defendant Haug is the ultimate decisionmaker for the jail, sets and implements its policies and procedures, and oversees its operations.

115. Based on the statements made by Defendant Bain to Ms. Strater, the New River Valley Regional Jail Authority has a custom and policy, and a widespread practice, of not providing inmates with medical care for serious medical conditions.

116. The Jail's custom and policy reflects its deliberate indifference to the serious medical needs of inmates and detainees like the Plaintiff.

117. The Jail's custom and policy, and widespread practice, of not promptly providing inmates with emergency medical care for serious medical conditions, was a direct and proximate cause of the Plaintiff's injuries.

118. Bain's statements to Strater, and the behavior of the jail employee Defendants with respect to Mr. Heim, suggests that Haug failed to provide adequate training to the jail employee Defendants sufficient to prevent the violation of detainees' constitutional rights.

119. The lack of training regarding the recognition of serious medical conditions and requirements for prompt provision of emergency medical treatment for serious medical conditions amounted to deliberate indifference to the constitutional rights of inmates and pretrial detainees.

120. The lack of training was a direct and proximate cause of Mr. Heim's injuries.

121. On information and belief, prior to the Plaintiff's detention on April 26, 2023, NRVRJ had received multiple inmate grievances and reports that detainees were repeatedly denied appropriate medical attention for serious, clearly identifiable medical needs, yet jail staff failed to obtain medical treatment or to require escalation to outside care.

122. In *Barley v. New River Valley Regional Jail–Medical Department*, No. 7:16-CV-00280, 2018 WL 4624828 (W.D. Va. Sept. 26, 2018), the Court denied summary judgment with respect to a deliberate indifference claim against on-site medical staff who denied timely care for a detainee's worsening skin rash.

123. In *Wright v. Ferguson*, No. 7:22-cv-00395, 2023 WL 6304687 (W.D. Va. Sept. 26, 2023), the Court denied summary judgment without prejudice to permit additional discovery as to an NRVRJA inmate's claim of deliberate indifference to serious medical needs.

124. In *Hatcher v. Hauffman*, No. 7:20-CV-00473, 2021 WL 308921 (W.D. Va. July 21, 2021), the Court noted an NRVRJA inmate's allegation that jail personnel "has refused to provide prescribed medical treatment."

125. Moreover, about three and a half years prior to Mr. Heim's incident, a detainee being held at NRVRJA for public intoxication died of acute buprenorphine toxicity. See WDBJ.com, "No charges filed in death of New River Valley Jail inmate," https://www.wdbj7.com/content/news/State-police-investigating-inmate-death-at-New-River-Valley-Regional-Jail-560189341.html (Sept. 12, 2019). This incident also put Haug on notice of the need to carefully monitor detainees suspected of being intoxicated and the need to train subordinates in that regard.

126. Just two and a half months before Mr. Heim's detention, Defendant Bettinger and other NRVRJA personnel were sued under § 1983 for deliberate indifference to a detainee's serious medical needs. *Perry v. Lilly*, No. 7:23-CV-00089. That complaint put Defendant Haug on notice that her subordinates were violating the clearly established Fourteenth Amendment rights of pretrial detainees and should have prompted her to provide additional training, issue appropriate discipline, or otherwise address the problem. The detainee in the *Perry* case alleges, among other things, "that he continued to scream in pain and beg for help after [correctional officers] threw him in another cell; and that his cries for help were ignored for an hour and a half." *Perry*, 2023 WL 7305055, at *5 (W.D. Va. Nov. 6, 2023) (denying motion to dismiss deliberate indifference claim). In other words, he alleges that correctional officers at NRVRJ ignored his need for medical attention.

127. These earlier incidents demonstrate a recurring pattern of failure to respond to serious medical needs at NRVRJ. The earlier lawsuits and reporting put Haug on notice of widespread unconstitutional practices with respect to medical care at the facility.

128. Defendant Haug, as Superintendent and ultimate policymaker responsible for operations and medical-response procedures, possessed actual and/or constructive awareness of these prior lawsuits and pattern evidence—including through incident and grievance review, internal reports, news reporting, or intake data—yet failed to alter or enforce protocols to ensure timely escalation of emergent medical conditions, such as stroke symptoms. Her failure to respond, retrain staff, or implement effective

escalation policies despite repeated known deficiencies amounts to deliberate indifference.

129. As a direct and proximate result of Defendant Haug's deliberate indifference, the Defendants charged with observing and housing Mr. Heim did not administer or call for emergency care for more than 28 hours despite his obvious stroke symptoms. Had Defendant Haug implemented adequate protocols, such as mandatory EMS activation upon signs of neurological impairment or rapid escalation procedures, Mr. Heim's injuries would have been avoided or reduced.

130. Defendant Haug's inaction was not negligent but conscious and deliberate: she failed to respond after multiple similar claims at NRVRJ,and thus tacitly authorized continued indifference among her subordinates.

**Count VI – Deprivation of Civil Rights – 42 U.S.C. § 1983 – *Monell* Claim Against Defendant New River Valley Regional Jail Authority**

131. The Plaintiff restates and incorporates the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

132. Based on the statements made by Defendant Bain to Ms. Strater, the New River Valley Regional Jail Authority has a custom and policy, and a widespread practice, of not providing inmates with medical care for serious medical conditions.

133. The Jail Authority's custom and policy reflects its deliberate indifference to the serious medical needs of inmates and detainees like the Plaintiff.

134. The Jail Authority's custom and policy was a direct and proximate cause of the Plaintiff's injuries.

135. Bain's statements, and the behavior of the Jail Defendants with respect to Mr. Heim, suggests that the Jail Authority, through Haug, failed to provide adequate training

to Jail employees.

136. The lack of training was a direct and proximate cause of Mr. Heim's injuries.

137. On information and belief, the New River Valley Regional Jail Authority maintained, through formal or de facto policies, a persistent practice of delaying or denying outside medical assessment or transfer for detainees with clearly emergent medical needs, instead relying on routine "sick call" protocols. This practice is illustrated by the Plaintiff's 28-hour denial of care upon detention, despite evidence of acute neurological distress.

138. NRVRJA had a policy and practice of having a booking officer complete a medical screening form based on information provided to the booking officer by the detainee. In other words, NRVRJA's policy and practice required the detainee to have the presence of mind and wherewithal to be able to provide accurate information and assess his own medical needs. This policy and practice is clearly inadequate in the case of a detainee in the midst of a medical emergency like a stroke.

139. NRVRJA had a policy and practice of not requiring medical staff to screen detainees and inmates until they had been at the jail for *seven days*. Indeed, NRVRJA policy only provided for a medical professional to be present at the jail and accessible to inmates once a week. This policy and practice is plainly inadequate to diagnose and provide adequate medical care to detainees experiencing medical emergencies, and it creates a serious and obvious risk of violation of detainees' Fourteenth Amendment right to adequate medical care and freedom from deliberate indifference to their serious medical needs.

140. Bain's statements that "we have no medical assistance at the jail" and "we don't

have anyone here who can help him" reflect an institutional acknowledgement and acceptance of this lack of immediate medical capacity.

141. Prior to Mr. Heim's detention, NRVRJ faced multiple civil suit filings which placed the Authority on notice that its medical and emergency protocols were constitutionally insufficient. Nevertheless, the Authority failed to require staff to obtain immediate evaluation and EMS activation when confronted with signs of serious or life-threatening medical emergencies.

142. This longstanding custom and institutional inaction foreseeably caused Mr. Heim's injury: without an institutional requirement for timely outside evaluation and transport, line officers were not trained or required to act swiftly, resulting in the 28- to 30-hour delay during which Mr. Heim's chance for tPA and other critical treatment was lost.

143. The Authority's deliberate failure to train its staff in recognizing and responding to emergent medical conditions amount to deliberate indifference and constitute an official policy of inadequate medical care, in violation of § 1983.

**Count VII – Gross Negligence – Vicarious Liability**
**Against New River Valley Regional Jail Authority**

144. The Plaintiff restates and incorporates the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

145. During his detention with the New River Valley Regional Jail, the Plaintiff had a serious and life-threatening medical need, an acute stroke.

146. Notwithstanding this serious and life-threatening medical need, Defendants Bain, Bettinger, Stuart, Songer, and Willard exhibited a degree of negligence showing indifference to Plaintiff and an utter disregard of prudence that amounted to a complete

neglect of the safety of Plaintiff, by denying, delaying, and/or withholding the medical services necessary, thereby creating a substantial risk of permanent physical injury resulting in the unnecessary and wanton infliction of pain upon the Plaintiff.

147. The denial, delay, and/or withholding the provision of medical care was intentional, careless, reckless, willful and wanton, and/or grossly negligent, and was done with malice and/or deliberate indifference to the safety of the Plaintiff. Defendants Bain, Bettinger, Stuart, Songer, and Willard failed to exercise even slight diligence or scant care.

148. As a direct and proximate result of the gross negligence of Defendants Bain, Bettinger, Stuart, Songer, and Willard to the Plaintiff's serious medical needs, the Plaintiff has sustained serious and permanent physical injuries, which has caused him, and will continue to cause him, to expend substantial sums of money for medical treatment, loss of income, and severe and permanent losses to his lifestyle.

149. Defendant New River Valley Regional Jail Authority is vicariously liable for the gross negligence of its employees as described above.

## **Prayer for Relief**

WHEREFORE, FOR THE FOREGOING REASONS, Plaintiff, by counsel, prays for and demands judgment against Defendants as follows:

(1) Compensatory damages in an amount to be determined by the jury;

(2) Punitive damages in an amount to be determined by the jury;

(3) Pre-judgment interest from April 26, 2023;

(4) Post-judgment interest;

(5) Attorneys' fees and costs as authorized by 42 U.S.C. § 1988; and

(6) Such other legal and equitable remedies as may be allowed by law.

**TRIAL BY JURY IS DEMANDED.**

WILLIAM HEIM, by his guardian,
NICOLE MARIE BRITTAIN

By: */s/ Alexis I. Tahinci*
Of Counsel

Matthew J. Moynihan (VSB No. 86430)
Bischoff Martingayle, P.C.
208 East Plume Street, Suite 247
Norfolk, Virginia 23510
Telephone: (757) 935-9193
Facsimile: (757) 440-3924
Email: mjm@bischoffmartingayle.com

Alexis I. Tahinci (VSB No. 85996)
Tahinci Law Firm PLLC
105 Ford Avenue, Suite 3
Kingsport, Tennessee 37663
Telephone: (423) 406-1151
Facsimile: (423) 815-1728
Email: alexis@tahincilaw.com

*Counsel for the Plaintiff*